UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DONNA KOEPPEL, individually, and as parent of Grace LaBruno, a minor,<br><br>Plaintiffs,<br><br>v.<br><br>ANDREW BASSETT, individually and in his capacity as an Officer of the Township of Nutley Police Department, ERIC STABINSKI, individually and in his capacity as an Officer of the Township of Nutley Police Department, and TOWNSHIP OF NUTLEY,<br><br>Defendants. | Civ. No. 08-cv-04543 (KM)<br><br>OPINION |

Plaintiff Donna Koeppel, individually and on behalf of her daughter, Grace LaBruno, a minor, commenced this action against the Township of Nutley and two officers in the Township of Nutley Police Department, Andrew Bassett and Eric Stabinski. The action arises from Koeppel's arrest in January 2007 on charges of assaulting a police officer and obstruction. A state grand jury ultimately declined to return an indictment on those charges. The complaint asserts claims for false arrest and excessive force under 42 U.S.C. 1983, as well as common law claims for false arrest, assault and battery, intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence. Additionally, the complaint asserts common law claims on behalf of LaBruno for intentional and negligent infliction of emotional distress. Presently before the Court are pretrial *in limine* motions filed by defendants Bassett and Stabinski (Dkt. No. 146) and by plaintiff Koeppel (Dkt.

1

No. 147). For the reasons set forth below, this Court will grant in part and deny in part the defendants' *in limine* motion, and will deny Koeppel's *in limine* motion.

## I. DEFENDANTS' MOTION *IN LIMINE*

### A. Summary Judgment on LaBruno's Claims

The overall title of defendants' multipart submission is "Motion in Limine." Part one of their motion, however, is in substance a motion for summary judgment on Koeppel's claims on behalf of LaBruno for intentional and negligent infliction of emotional distress. Citing *Portee v. Jafee*, 84 N.J. 88 (1980), defendants contend that the evidence of record does not establish the elements of a claim for emotional distress predicated upon a plaintiff's witnessing an injury suffered by a third party. Koeppel argues that the defendant's motion for summary judgment should be denied because it is untimely and fails to comply with the requirements of Rule 56. Koeppel further argues that the legal standard laid down in *Portee* is inapplicable, but that in any event there is sufficient evidence in the record to defeat summary judgment.

### 1. Timeliness

I first consider whether the defendants may move for summary judgment at this late stage.[1] It is not unusual for a motion in limine to contain elements of summary judgment; the exclusion of certain evidence, for example, may

---

[1] Apart from the blanket requirement in the Pre-Trial Order that all motions be fully briefed no later than two weeks prior to trial (Dkt. No. 125, at 2), it appears that the court never set a deadline for the filing of dispositive motions in any of the scheduling orders entered on the docket. The Amended Scheduling Order entered by then-Magistrate Judge Cecchi on May 3, 2010, states that "Dispositive motions will be filed on a date to be determined." (Dkt. No. 22) None of the subsequent Amended Scheduling Orders entered by her successor contain such a deadline. (See Dkt. Nos. 62, 68, 90)

render a claim untriable. The Third Circuit has therefore held that a district court may grant summary judgment in connection with a motion *in limine.* Fairness requires, however, that the party opposing the motion be given (1) notice that the court is contemplating granting summary judgment, and (2) adequate time to marshal its evidence to show that there is a genuine issue of material fact. *See Howard Johnson Int'l v. Cupola Enterprises, LLC,* 117 Fed. Appx. 820, 823 (3d Cir. 2004); *Bradley v. Pittsburgh Board of Education,* 913 F.2d 1064, 1069-70 (3d Cir. 1990). Both requirements are met here.

Plaintiffs were placed sufficiently on notice that this was a dispositive summary judgment motion, not merely a motion in limine. The Pre-Trial Order stated that the defendants would "move to dismiss Plaintiff, Grace LaBruno's personal injury claims ... [because] LaBruno cannot meet the burden established by *Portee v. Jafee.*" (Dkt. No. 125, at 3) The Pre-Trial Order thus put Koeppel on notice that the defendants' motion was potentially dispositive.[2] True, the overall title of defendants' motion is "Motion in Limine." Point I of their brief, however, is titled

> Labruno's Claim For Suffering Emotional Distress From Witnessing Injury To Her Mother, Donna Koeppel, Must Be Dismissed, As Plaintiff Cannot Satisfy The Elements Of Said Claim As Required by Portee v. Jaffee, 84 N.J. 88 (1980)

(Dkt. No. 146 at 2, 7) The argument within the point summarizes the evidence of record, purports to interpret it "in a light most favorable to the Plaintiff" (*id.* at 10, 11), and argues that it fails to satisfy the elements of *Portee.*[3] A person reading it would gather that the evidence developed in discovery was being measured against the elements of the cause of action. Such a motion, however characterized, is clearly a dispositive motion. That said, the motion is ill-

---

[2] Koeppel states in her moving papers that the "Defendant officers did not move for summary judgment; and in response to an inquiry by Mag. Judge Arleo...their counsel indicated that [they] did not intend to make such a motion." (Dkt. No. 153, at 8) There is no citation to the record.

[3] The other chief authority on which defendants rely, *Trisuzzi v. Tabatchnik,* 285 N.J. Super. 15 (App. Div. 1995), affirms a no-cause jury verdict.

defined: it requests that the claim be "dismissed," and it does not use the words "summary judgment," cite Rule 56, or comply with the procedures governing summary judgment in the local rules.

Nevertheless, plaintiff Koeppel's responding papers recognize defendant's motion as one for summary judgment motion—and object to it as such. Point I(a) of Koeppel's brief is entitled:

> Defendants' "motion in limine" with respect to Grace's claims is a belated, and procedurally defective, summary judgment motion.

(Dkt. No. 153 at 8) Point I(b), in the alternative, opposes the motion on the merits. It argues that Labruno's claims are not properly understood as *Portee* claims at all. *Portee,* the argument runs, applies only to certain claims of *negligent* infliction of emotional distress upon a "bystander," and does not affect Labruno's claim of *intentional* infliction of emotional distress. Citing extensively to attached excerpts from the record, and discussing applicable case law, Point I(b) attempts to establish that there is ample evidence to support such a claim. Finally, Point I(b) attempts to establish that Labruno's particular claim of negligent infliction of emotional distress falls within an exception to the coverage of *Portee*. Citing to the evidence of record and quoting applicable case law, plaintiff argues that her claims "should ... be submitted to a jury." (Dkt no. 153 at 27) In short, plaintiffs were sufficiently on notice that they faced a dispositive motion that required them to marshal the evidentiary record. And they responded appropriately, citing case law and directing the court to portions of the record that support their position.

Koeppel had three weeks to draft her motion response—more than the standard ten days under this Court's local rules—and she never requested an extension. *See* Loc. Civ. R. 7.1(d); *cf. Howard Johnson Int'l,* 117 Fed. Appx. at 823 (eight-day response time did not prejudice nonmovant). That was sufficient.

In an abundance of caution, however, I informed the parties by text order (Dkt. No. 164) that I would treat the motion as one for summary judgment, and I afforded plaintiff the opportunity to supplement her opposition accordingly. *Cf. Rycoline Products, Inc. v. C & W Unlimited*, 109 F.3d 883, 886-87 (3d Cir. 1997) (before considering material outside the pleadings, thereby converting a Rule 12 motion to dismiss into a motion for summary judgment, court must give parties fair warning and the opportunity to supplement their submissions). In response, the plaintiff submitted an additional letter brief as well as some additional evidence (Dkt. No. 165), which I have reviewed and incorporated in my discussion.

Accordingly, I find that the Court is not procedurally barred from treating part one of the defendants' motion *in limine* as a motion for partial summary judgment.

### 2. Summary Judgment

On behalf of LaBruno, Koeppel asserts claims of negligent infliction of emotional distress ("NIED") intentional infliction of emotional distress ("IIED"). Citing *Portee, supra*, the defendants argue that in order for a "witness to the horrible injury of another to pursue a psychic injury of his or her own," she must successfully show that: "(1) the claimant must have a marital or intimate familial relationship with the injured person; (2) there is a death or serious physical injury caused by a defendant's negligence; (3) the claimant must have observed the death or serious injury at the scene of the accident; and (4) the claimant must be able to show that there was resulting severe emotional distress." *Portee*, 84 N.J. at 101. The defendants contend that summary judgment must be granted as to Koeppel's emotional distress claims on behalf of LaBruno because they do not meet the second, third and fourth elements of the *Portee* test. (*See* Dkt. No. 146, at 11)

### a. Negligent infliction of emotional distress ("NIED")

*Portee,* says Koeppel, does not govern this particular NIED claim. Relying primarily on *Strachan v. John F. Kennedy Memorial Hosp.,* 109 N.J. 523 (1988), she contends that *Portee* applies only to cases in which a bystander is injured by witnessing a close relative suffer injury or death caused by a breach of duty owed *to that relative.* LaBruno's claim, says Koeppel, is different; she claims that the defendants, through their negligent conduct in arresting Koeppel, breached a duty owed directly to LaBruno herself. That, Koeppel maintains, distinguishes *Portee.*

Like Koeppel, I read *Strachan* to exempt certain NIED claims from the *Portee* standard. I do not agree, however, that Labruno's claim falls within *Strachan*'s narrow exception.

In *Strachan,* a young man on life support was declared dead. For several days thereafter, the hospital failed to honor his parents' instruction that he be taken off the respirator. The parents sued the hospital for NIED arising from the hospital's treatment of their son's body. A money judgment in the parents' favor was initially reversed by the Appellate Division because it failed to satisfy the first and third elements of the *Portee* test. The New Jersey Supreme Court reversed, holding that the Appellate Division's error lay "in the mistaken assumption that the *Portee* criteria were intended to cover all emotional distress actions." 109 N.J. at 535. Unlike the *Portee* plaintiff, the *Strachan* parents did not sue based on their distress at witnessing a tortious injury to their son. Because the son was no longer alive, the hospital could not have breached any duty to him. Rather, the parents' claim arose from the hospital's breach of its duty to handle corpses with respect, a duty that, under well established law, was owed directly to the parents as survivors. *Id.* at 535-36. *Strachan* thus held that, while a "bystander" claim is governed by *Portee,* a "direct" emotional distress claim is governed by "standard negligence principles." *Id.* at 534.

*Strachan* added that such a direct emotional distress claim, unlike a *Portee* bystander claim, will ordinarily require a showing that the plaintiff has suffered physical injury as well as emotional injury. That physical-injury requirement is a corroborative safeguard against spurious claims of emotional distress.[4] *Id.* at 537; *see also Caputzal v. The Lindsay Co.*, 48 N.J. 69, 76 (1966); *Falzon v. Busch*, 45 N.J. 559, 561 (1965). *Strachan* recognized only two established exceptions to the physical-injury requirement: "the first involves negligent transmission of a message concerning a relative, and the second pertains to negligent mishandling of a corpse." 109 N.J. at 537. In those extreme and shocking cases, there is "an especial likelihood of genuine and serious mental distress, arising from [] special circumstances, which serves as a guarantee that the claim is not spurious." *Id.* at 538. In such a case, the plaintiff need not show that she suffered physically in order to substantiate the claim of emotional distress.

A "direct" NIED claim, then, arises only under narrow circumstances: for example, where the primary victim is deceased, and where the plaintiff herself is owed a direct duty that is well established at law. And even within that narrow class of cases, the plaintiff must establish that she has suffered physical injury unless there is a recognized exception, or unless the extreme circumstances of the case otherwise guarantee that the claim is genuine.

A "bystander" claim, in contrast, must satisfy the four-part *Portee* test: (1) intimate familial relationship; (2) death of, or serious physical injury to, the family member; (3) direct observation by the plaintiff; and (4) severe emotional distress by the plaintiff. *See also Decker v. Princeton Packet, Inc.*, 116 N.J. 418, 430 (1989) (stating that emotional distress cases have evolved "from denying recovery unless the emotional distress is accompanied by physical impact [to the plaintiff], to permitting recovery if the emotional distress results in physical injury [to the plaintiff]," and, finally, to permitting recovery "even in the

---

[4]   This requirement that the *emotional-distress plaintiff* have suffered corroborative physical injury should not be confused with elements 2 and 3 of *Portee*, which require that the *primary victim* have suffered death or serious physical injury.

7

absence of physical injury" if the *Portee* elements are met) (internal quotations and citations omitted).

LaBruno's NIED claim appears to fit the classic "bystander" profile: she witnessed harm to a close relative and suffered distress as a result. Such a bystander claim is subject to the requirements of *Portee*. At oral argument, counsel appeared to concede that the alleged injuries to Koeppel (*i.e.*, the primary victim, not the NIED plaintiff), do not rise to the level of the "serious physical injury" required by element 2 of the *Portee* test.

For example, in *Trisuzzi v. Tabatchnik*, 285 N.J. Super. 15, 26 (App. Div. 1995), a wife brought a *Portee* NIED claim against the owner of a dog. The wife had seen the dog attack her husband and bite his hands and groin. These injuries, the court held, did not give satisfy element 2 of the *Portee* test; they were "not serious enough to disable [the] husband" and he was able to "walk[] home from the incident." *Id.* A NIED claim will not lie for witnessing such injuries, which are significant but not sufficiently serious.

Koeppel's physical injuries, like those of the husband in *Trisuzzi*, were not disabling. The parties voice some disputes, but neither side claims that Koeppel could not function after the incident or that, for example, she could not walk. In Koeppel's own account, the defendants "hit[] her hard on the right arm with a handcuff, kick[ed] her cane into the street, grabb[ed] her right arm and thr[ew] her to ground." (Dkt. No. 153, at 13)  While on the ground, Koeppel asserts that defendant Bassett "stuck his knee into [her] spine, breaking her neuro-spinal inhibitor stimulator, causing a shock to [her] body and forcing [her] to urinate all over herself." (*Id.* at 14) These alleged injuries are certainly not minimal. On the other hand, they were not severely shocking to an observer: there was no bloodshed, no broken bones, and no employment of a weapon. In short, there was no "serious" physical injury within the meaning of *Portee*. LaBruno's NIED claim must therefore fail.

Koeppel tries to save LaBruno's NIED claim by characterizing it as a "direct" claim, rather than a "bystander" claim. That characterization is not

8

appropriate. She cites no established tort duty owed directly to LaBruno, like the hospital's duty to survivors to handle corpses properly. The "direct" duty claim boils down to the tautology that the police had a duty not to commit the tort of NIED itself.[5]

Summary judgment is therefore granted in favor of the defendants on LaBruno's claim for negligent infliction of emotional distress.

### b. Intentional infliction of emotional distress ("IIED")

Koeppel also asserts a claim on behalf of LaBruno for intentional infliction of emotional distress ("IIED"). To establish a claim for IIED, the plaintiff must show that the defendants intentionally engaged in extreme and outrageous conduct, that such conduct was the proximate cause of the plaintiff's emotional distress, and that the emotional distress is severe. *See Buckley v. Trenton Saving Fund Society*, 111 N.J. 355, 366 (1988).

*Portee,* by its own terms, applies only to claims for NIED. *Portee*, 84 N.J. at 101 ("The cause of action we approve today for the negligent infliction of emotional distress..."). Defendants rely solely on *Portee* and cases interpreting it. They make no separate argument or showing that summary judgment is appropriate on the IIED claim. As to the claim for IIED, I think an issue of fact is presented, and I will deny summary judgment.

---

[5] In the alternative, even assuming *arguendo* that this could be characterized as a "direct" claim, it would be necessary to show either (a) that LaBruno experienced physical injury that corroborates her claim of emotional injury, or (b) that her claim should be exempt from this requirement because the tort itself is so shocking that her emotional injuries may be presumed to be "unmistakably genuine." *Strachan*, 109 N.J. at 537. Reviewing the record, I find no evidence that LaBruno suffered physical injury. In her moving papers and supplemental submission, Koeppel asserts that LaBruno has experienced PTSD following her altercation with the defendants. However, the alleged manhandling of Koeppel (when compared to, say, traumatic physical injury or abuse of a corpse) does not "unmistakably" betoken severe emotional injury.

### B. Competency of Grace LaBruno

Defendants next request that the Court conduct a pretrial *voir dire* examination of LaBruno pursuant to Federal Rule of Evidence 104. *See* FED. R. EVID. 104(a), (c). LaBruno, now eleven, was three years old at the time of the incident. The defendants very plausibly assert that LaBruno's memory may not be reliable, or that it may have been influenced by conversations with her mother over the years. Defendants have not, however, offered psychological or other expert testimony as to the capacity of this child witness. At oral argument, defense counsel made it clear that the relief they currently seek is limited: only that the court convene an informal hearing in chambers at which the court would ask LaBruno a handful of questions, preferably questions agreed on by the parties. Koeppel replies that defendants should have elicited evidence regarding LaBruno's competency during her deposition, and that all other matters may be handled in cross-examination.

I am doubly concerned: first, that this child witness be treated with care and consideration, and second, that her current memory of events at the age of three may be questionable. I will grant the limited relief requested by the defendants. I have directed the parties to submit a list of *voir dire* questions, preferably an agreed list. On the record but in chambers, the court will address those questions to LaBruno, following up as necessary.

### C. Admissibility of Medical Records Regarding Koeppel's Prior Diagnosis of PTSD.

The Defendants next argue that the medical records of Dr. Talin Dadoyan should be admitted in evidence. Dr. Dadoyan, one of Koeppel's treating physicians, diagnosed her with post-traumatic stress disorder ("PTSD") two years before the incident in question. Dr. Dadoyan was unavailable for

deposition, however, and will not testify at trial. Koeppel, citing New Jersey law,[6] claims that the records are therefore inadmissible hearsay.

Particularly at oral argument, defendants stressed that exclusion of Dr. Dadoyan's records would hobble their cross-examination of Dr. William Head, one of Koeppel's witnesses. Dr. Head is expected to testify that Dr. Dadoyan's prior diagnosis was incorrect; that Koeppel was not already suffering from PTSD when she was arrested by the defendants; and that the defendants' conduct was the sole cause of Koeppel's PTSD.

Federal Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Dr. Dadoyan will not be testifying at trial, and her records contain statements regarding her treatment of Koeppel which, if offered for their truth, would certainly constitute hearsay. Of course, not all hearsay is inadmissible. Defendants state that they wish to admit these records, not directly for their truth content, but rather to impeach the testimony of Dr. Head.

Evidence otherwise subject to the hearsay bar may be admitted for the limited purpose of impeaching a witness. *See* Fed. R. Evid. 607; *see also Goodman v. Penn. Turnpike Comm'n*, 293 F.3d 655, 666 (3d Cir. 2002) ("A party can attack a witness's credibility using otherwise inadmissible evidence, but cannot pretend that inadmissible hearsay evidence is being used to impeach a witness so that the jury will hear its substance."); *United States v. Crowder*, 346 F.2d 1, (6th Cir. 1964), *cert. denied* 382 U.S. 909 (1964) (testimony admitted to impeach a witness does not supply needed substantive testimony); *Vecchio v. DeLuca*, 2010 WL 3303826, at *4 (W.D. Pa. Aug. 20, 2010) ("Assuming the Court would permit use of the hearsay statements for

---

[6] The two cases cited by Koeppel rely on New Jersey Rule of Evidence 808 to hold that expert opinions contained in records otherwise admissible under the business records exception may be excluded when the declarant is unavailable for cross-examination. *See Nowacki v. Community Medical Center*, 279 N.J. Super, 276, 281-82 (App. Div. 1995) and *Lazorick v. Brown*, 195 N.J. Super 444, 451 (App. Div. 1984). Rule 808 has "no express counterpart" in the Federal Rules of Evidence, which govern the admissibility of evidence in this Court.

11

impeachment purposes, they would not constitute substantive evidence, and the jury would be so instructed."); *In re Jacoby Airplane Crash Litig.*, 2007 WL 2746833, at *7 (D.N.J. Sept. 19, 2007) ("[T]he Court's ruling here is that [the hearsay evidence] is admissible for impeachment purposes, not for the truth of the matter, i.e., not for the substantive opinion on causation.")

Assuming Dr. Head testifies as expected, I will permit defendants to use Dr. Dadoyan's records for the sole purpose of impeaching his testimony. I will, however, instruct the jury that the records are to be considered for impeachment purposes only. Exercising my discretion to balance probativeness and prejudice under Rule 403, I will also limit the extent of their use, so that impeachment does not become a subterfuge for smuggling large amounts of inadmissible material to the jury.

### D. Testimony of Doctor Esha Khoshnu

Dr. Esha Koshnu, a psychiatrist, diagnosed Koeppel and LaBruno with PTSD after the incident. The defendants argue that Dr. Koshnu should not be permitted to testify as an expert witness because she was not listed in Koeppel's Rule 26 disclosures and has not submitted an expert report. They add that, because Dr. Koshnu diagnosed Koeppel without reviewing her medical history, she should not be permitted to testify as to the origin of Koeppel's PTSD or as to the prior diagnoses of other doctors. Koeppel responds that, as Koeppel's treating physician, Dr. Koshnu need not be designated as an expert, and may testify to anything she directly observed in the course of treatment. Koeppel also notes that the defendants themselves showed Dr. Koshnu certain prior medical records at her deposition, and therefore cannot now preclude her from testifying about them.

A treating physician, although obviously possessed of expertise, may be a fact witness as to matters learned and observed in the course of treating the patient. There is, however, a line to be drawn. An opinion about causation which relies on facts beyond the personal knowledge of the doctor, for example, is properly regarded as expert testimony, not fact testimony. Such an opinion is

inherently based on "scientific, technical, or other specialized knowledge" under Federal Rule of Evidence 702.[7] See *Allen v. Parkland Sch. Dist.*, 230 F. App'x 189, 195 (3d Cir. 2007); *Collins v. Prudential Inv. & Ret. Servs.*, 119 F. App'x 371, 379 (3d Cir. 2005); *Pease v. Lycoming Engines*, 2012 WL 162551, at *12 (M.D. Pa. Jan. 19, 2012); *Jorden v. Steven J. Glass, MD*, 2010 WL 3023347, at *3 (D.N.J. July 23, 2010).

To opine that the defendants' conduct caused the PTSD of Koeppel or LaBruno, Dr. Koshnu would have to testify in her capacity as an expert. Dr. Koshnu, however, was not proffered as an expert witness and has not met any of the prerequisites for testifying as one.

Rule 26(a)(2) requires the identification in advance of any expert witness who may testify at trial. See FED. R. CIV. P. 26(a)(2)(A). It further requires that an expert "retained or specially employed to provide expert testimony" must submit a detailed report concerning her anticipated testimony. See FED. R. CIV. P. 26(a)(2)(B). An expert witness who has not been "retained" within the meaning of Rule 26(a)(2)(A) is not required to submit a full expert report, but must still disclose "the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705." See FED. R. CIV. P. 26(a)(2)(C). Additionally, both retained and non-retained experts must furnish the required disclosures "in the sequence that the court orders." FED. R. CIV. P. 26(a)(2)(D).

---

[7] Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Here, Dr. Koshnu did not submit an expert report or the less demanding disclosure required for non-retained experts. The Magistrate Judge imposed a deadline of August 7, 2013, for concluding expert discovery. (*See* Dkt. No. 111).[8] Koeppel did not at any time before that date disclose that she intended to call Dr. Koshnu as an expert. Accordingly, I hold that Dr. Koshnu will be limited to testifying as a fact witness. *See Patterson v. Howard*, 2010 WL 105002, at *4 (D.N.J. Mar. 18, 2010) (requiring a treating physician who failed to submit an expert report to testify as fact witness).

As a fact witness, Dr. Koshnu may testify to matters observed in connection with her "treatment, examination, and diagnosis" of Koeppel or LaBruno. *Frederick v. Hanna*, 2007 WL 853480, at *6 (W.D. Pa. Mar. 16, 2007). She may not offer expert opinion testimony regarding the cause Koeppel's or LaBruno's PTSD, the permanency of their injuries, or their prognosis. *See Collins*, 119 Fed. App'x. at 379 (because treating physician was not an expert witness, he could only testify as to diagnosis and treatment, and was precluded from giving expert opinion testimony, including the effect of the diagnosis on the plaintiff's life); *Patterson*, 2010 WL 105002, at *4 (prohibiting the plaintiff from using treating physician to "elicit testimony regarding the cause of [the plaintiff's] condition or his future prognosis."). Dr. Koshnu may not offer opinion testimony regarding other doctors' prior diagnoses; she may, however, state the extent to which she actually, contemporaneously reviewed and relied on such diagnoses when diagnosing and treating Koeppel or LaBruno. *See Goodman v. Staples*, 644 F.3d 817, 819 (9th Cir. 2011) (stating that where a treating physician testifies to an opinion formed by reviewing information

---

[8]  Although Koeppel later designated Dr. Koshnu as an expert witness in the Pre-Trial Order (Dkt. No. 125), this disclosure came too late to avoid prejudice to the defendants. Dr. Koshnu was deposed as a fact witness. If she were allowed to testify as an expert witness, I would have to allow the defendants to depose her as an expert witness, which will only result in "more expense and delay." *See Allen*, 230 F. App'x at 196.

14

outside the course of treatment, then she "morphs into a witness hired to render expert opinions" and must furnish an expert report.).

The defendants' motion *in limine* is therefore granted. Dr. Koshnu's testimony will be permitted, but will be subject to limitations described above.

### E. Evidence Relating to the Grand Jury Proceedings

The defendants next seek to preclude any evidence concerning the state grand jury's failure to indict Koeppel for assault and obstruction, citing *Galbraith v. Hartford Fire Ins. Co.*, 464 F.2d 225, 226 (3d Cir. 1972). Koeppel attempts to distinguish *Galbraith* and asserts that the grand jury's "no bill" should be admitted because it is relevant to her false arrest claims.

In *Galbraith*, the plaintiff sought to recover under an insurance policy for damages as a result of a fire. The insurer asserted as an affirmative defense that the plaintiff started the fire. At trial, the judge admitted evidence that three years had passed without arson charges having been brought against the plaintiff. On appeal, the Third Circuit held that such evidence was "inadmissible...and highly prejudicial to the issue of whether or not the [plaintiff] had in fact committed arson." 464 F.2d at 227. The Court reasoned that a lay juror could easily draw unwarranted conclusions from what was, at most, an exercise of prosecutorial discretion. *Id.*

*Galbraith* is not precisely on point here. It involved the mere absence of a criminal charge; it did not specifically address a grand jury's specific decision to "no bill" the case after the presentation of evidence.[9] The few Third Circuit opinions that cite *Galbraith* concern a prosecutor's failure to charge, a decision traditionally considered an exercise of discretion. *See, e.g., Johnson v. Elk Lake*

---

9     At most, the Court noted in dicta that "New Jersey courts have consistently held that the grand jury's refusal to bring a bill of indictment is, as evidence, only *res inter alios acta* as to the question of whether probable cause existed to bring the complaint." 464 F.2d at 227.

15

*Sch. Dist.*, 283 F.3d 138, 148 n.5 (3d Cir. 2002) ("In *Galbraith*, the trial court allowed the defendant to testify as to his nonprosecution. We reversed, noting that this testimony was inadmissible and 'highly prejudicial.'"); *Am. Home Assur. Co. v. Sunshine Supermarket, Inc.*, 753 F.2d 321, 325 (3d Cir. 1985) ("evidence of non-prosecution was highly prejudicial because it went to the principal issue in this case") (citing *Galbraith*, 464 F.2d at 228). *But see Toscano v. Case*, 2013 WL 5333206, at *4 (D.N.J. Sept. 20, 2013) (citing *Galbraith* as "disapprov[ing] of using a grand jury's failure to indict for the purpose of establishing probable cause").

In *Galbraith*, the balance of probativeness and prejudice was different. In that insurance case, the question of whether there was probable cause to charge plaintiff was at best indirectly relevant. In a false arrest case, however, the question of probable cause is directly relevant. Under both federal and New Jersey law, a claim for false arrest requires that "(1) there was an arrest; and (2) that the arrest was made without probable cause." *See Gooden v. Jubilee*, 2014 WL 3817153, at *1 (D.N.J. Aug. 4, 2014). The grand jury's failure to indict Koeppel is potentially probative of whether her arrest was supported by probable cause.[10] The evidence by its nature placed Koeppel at the initial stage of criminal proceedings—the arrest stage. Certainly, if Ms. Koeppel *had* been indicted, defendants would have urged that that circumstance established, or at least supported, probable cause for the arrest. The jury cannot be left to wonder whether criminal charges were pursued. Indeed, if left in the dark, the jury might make the plaintiff-unfavorable assumption that Koeppel, having been arrested, was charged or even convicted.

---

10   But not necessarily dispositive, of course. *See Dennis v. City of Bridgeton*, 2006 WL 3359712, at *4 (D.N.J. Nov. 17, 2006) (granting summary judgment for the defendant in a §1983 suit for false arrest even though the grand jury failed to indict the plaintiff). Any improvement or deterioration in the quality of the evidence after the date of arrest might enhance or undermine the probativeness of the grand jury's decision. A dramatic disparity might even tip the Rule 403 balance toward exclusion. There are no such indications here.

Here, the grand jury considered the charges against Ms. Koeppel, as well as Ms. Koeppel's counter-charges against the officers. It seems to have washed its hands of both. I will permit the jury—properly instructed—to hear that.

I say "properly instructed" because there is a wide gap between a grand jury's failure to indict and proof that the officers acted without probable cause at the time of the arrest. The jury will be so instructed: the evidence might have declined in value post-arrest, the grand jury enjoys unreviewable discretion, its reasons for declining to indict are unknowable, and a no-bill therefore does not in itself establish whether there was probable cause. Nevertheless, the evidence has some value, and I think that concerns about misleading the jury may be better addressed through an appropriate instruction rather than through categorical exclusion of the evidence. At the appropriate time, I will hear counsel as to the wording of such an instruction.

The motion to exclude evidence of the grand jury's "no bill" is therefore denied.

## II. PLAINTIFF'S MOTION *IN LIMINE*

Koeppel's motion *in limine* seeks to exclude two pieces of evidence: (i) a mug shot of Koeppel taken shortly after her arrest in which she can be seen smiling; and (ii) a surveillance video taken in March 2007 that shows Koeppel playing with LaBruno at a local playground. Koeppel challenges the relevance of both under Federal Rule of Evidence 401, and also asserts that they are unduly prejudicial under the balancing test of Federal Rule of Evidence 403. The defendants reply that the mug shot and video should be admitted because they are relevant to Koeppel's credibility and to the extent of her alleged injuries.

Rule 401 provides that "Evidence is relevant if: (a) it has any tendency to make a fact more probable than it would be without the evidence; and (b) the fact is consequence in determining the action." FED. R. EVID. 401. That is a low

threshold. By alleging claims for excessive force, assault and battery, and infliction of emotional distress, Koeppel has placed in issue the physical and emotional injuries she sustained as a result of the arrest. The mug shot and surveillance video bear on the severity of those injuries. Both are therefore relevant.

Even relevant evidence, however, may be excluded under Rule 403 if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403. Koeppel contends that the mug shot and video will create unfair prejudice and mislead the jury. As for the mug shot, she says, she was smiling only because she "took a double dose of Oxcontin" and because she was ordered to smile by the police photographer.[11] (Dkt. No. 147-1, at 4). As for the surveillance video, she claims that her physical condition on that day was atypical. (*Id.* at 9) These are bases for rebuttal and cross-examination, not for exclusion of the evidence. Unfair prejudice typically means "an undue tendency to suggest decision on an improper basis," most often an emotional one. FED. R. EVID. 403, Notes of Advisory Committee on Proposed Rules. There is little risk that either piece of evidence would encourage the jury to decide this case in an improper manner. Koeppel is free to suggest her own, contrary interpretation of the evidence, but the jury is entitled to draw its own conclusions.

I rule that the mug shot and surveillance video are admissible, and deny Koeppel's motion in limine.

---

[11] Obviously the mug shot is not prejudicial in the sense of revealing that Koeppel was arrested. The fact of arrest, of course, is the very foundation of her claims, and it will be before the jury.

### III. CONCLUSION

For the foregoing reasons, the defendants' *in limine* motion is granted in part and denied in part; and the plaintiff's *in limine* motion is denied.

An appropriate Order will issue.

Dated: February 17, 2015

**KEVIN MCNULTY**
**United States District Judge**